JOHN S. LEONARDO
United States Attorney
District of Arizona

REID C. PIXLER
Assistant United States Attorney
Arizona State Bar Number 12850
Two Renaissance Square
40 North Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Facsimile:  (602) 514-7662
E-mail: reid.pixler@usdoj.gov

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>        Plaintiff,<br><br>   v.<br><br>$46,500.00 in United States Currency,<br><br>        Defendant. | **Verified Complaint For Forfeiture *In Rem*** |

Plaintiff, United States of America, through its attorneys, JOHN S. LEONARDO, United States Attorney for the District of Arizona and Reid C. Pixler, Assistant United States Attorney, brings this complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"):

## NATURE OF ACTION

1. This is a civil action *in rem* to forfeit property to the United States pursuant to 21 U.S.C. § 881(a)(6), 18 U.S.C. § 981(a)(1)(C), and 18 U.S.C. §1956(h).

## DEFENDANTS IN REM

2. Defendant consists of $46,500.00 in United States currency ("defendant"), seized from Better Bail Bonds ("BBB"), also known as Arizona Asset Management Recovery, Inc. The defendant currency was seized on October 5, 2011, by the Drug Enforcement Administration Task Force Officers from BBB, as a result of a bond posted by Israel SANCHEZ.

3. Defendant is currently in the custody of the United States Marshals Service.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and 28 U.S.C. § 1355(a).

5. This Court will have *in rem* jurisdiction over the defendant currency upon the Court's issuance of an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), and the execution of said arrest warrant on the defendant currency pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

6. Venue is proper in this district:

    a) pursuant to 28 U.S.C. § 1355(b)(1)(A), because some of the acts or omissions giving rise to the forfeiture occurred in this district;

    b) pursuant to 28 U.S.C. §§ 1355(b)(1)(B) and 1395(b), because the defendant currency was found in this district.

## BASIS FOR THE FORFEITURE

7. The defendant currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it was furnished or intended to be furnished by a person in exchange for a controlled substance or listed chemical in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, or is proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*

8. The defendant currency is subject to forfeiture pursuant to conspiracy to engage in money laundering in violation of 18 U.S.C. §1956(h), therefore, forfeitable pursuant to 18 U.S.C. § 981(a)(1)(A).

9. The defendant currency is subject to forfeiture pursuant to 18 U.S.C. § 981 (a)(1)(C) which is personal property which constitutes or is derived from proceeds traceable to a violation of any offense constitution "specified unlawful activity" as defined in 18 U.S.C. §§ 1956(c)(7) and 1961.

**FACTS**

10. On or about August 31, 2011, at approximately 5:30 a.m., Pinal County Sheriff's Office ("PCSO") Deputy M. Miller stopped Israel Sanchez ("SANCHEZ"), who was driving in tandem with a second vehicle suspected of transporting bulk quantities of marijuana. SANCHEZ was driving a 2003 GMC ¾ Ton pick-up truck registered to SANCHEZ bearing Arizona license plate 1FR9663. During the stop, PCSO Deputies documented the registered owner as SANCHEZ.

11. Prior to confirming a positive identification of the driver, the PCSO Deputies realized SANCHEZ's vehicle was a diversion or "heat" vehicle used to distract law enforcement, and not the suspected "load" vehicle.

12. SANCHEZ was released and at approximately 5:40 p.m., Deputy Miller pursued the second vehicle, a silver Volvo S80, which moved from the slow lane of travel into a fast lane without using a turn signal, cut off another driver, and exited Interstate 8 without using a turn signal.

13. The driver of the silver Volvo S80 did not yield, ran a stop sign, and proceeded southbound on Thorton Road. The vehicle traveled approximately 100 yards, left the roadway, and began driving into the desert to the west of Thornton Road.

14. Deputy Miller observed the driver's side door of the vehicle open, and a white male exited the driver's door. The driver ran southwest into the desert.

15. Deputy Miller observed the passenger side door open and observed a Hispanic male dressed in a camouflage shirt and pants exit the passenger side of the vehicle. The passenger ran southwest into the desert.

16. Deputy Miller notified dispatch of the subjects' description and approached the vehicle to ensure there were no other occupants within the vehicle.

17. For officer safety reasons, Deputy Miller opened the back door of the vehicle. Based on his training and experience, Deputy Miller observed what appeared to be bundles of raw, compressed, packaged marijuana on the back seat.

18. Deputy Miller opened the trunk of the vehicle and observed bundles of what appeared to be raw, compressed, packaged marijuana. The vehicle contained in excess of 300 pounds of marijuana.

19. The vehicle bore Arizona license plate ARC5598, registered to a Cherry Gail Shugars. The vehicle was not reported stolen.

20. PCSO Deputy R. Warren ("Deputy Warren") arrived on the scene and pursued the subjects who had fled on foot.

21. After traveling through some Mesquite trees, and coming into open area, Deputy Warren observed a Caucasian male that matched the description of the driver who fled the scene.

22. As Deputy Warren moved closer, the Caucasian male saw Deputy Warren, and began to run faster in attempt to get away.

23. A patrol unit driven by Lieutenant J. Villegas, spotted the Caucasian male, and pursued him. Lieutenant Villegas detained the driver, and turned the driver over for transport to the PCSO substation. The Caucasian male driver was identified as Curtis Earl Heisler ("Heisler") and the Hispanic male passenger's name was unknown.

24. PCSO Deputies contacted Pinal County Task Force Officers ("PCTFO") for further investigation.

25. PCTFO J. Sexton interviewed Heisler at the PCSO substation after Heisler waived his Miranda Rights.

26. Heisler claimed "some guy" flagged him down for a ride, and when he arrived at the "location" people started loading "some stuff" into his vehicle and it was "too late to turn back."

27. When asked who the guy was that he was doing the "favor" for, Heisler stated he did not know.

28. PCTFO Sexton asked what the "stuff" was that had been loaded into his vehicle. Heisler stated he did not know.

4

29. When asked if he knew if it was marijuana, Heisler stated, "No."

30. Heisler stated he normally does favors for people, but he had made a mistake this time.

31. The passenger was identified as a Mexican citizen. Agents with the U.S. Border Patrol in Casa Grande, Arizona, removed the passenger for immigration violations.

32. The silver Volvo S80 bearing Arizona license plate ARC5598 and its contents were transported to the Pinal County Sheriff's Department in Florence, Arizona, for processing.

33. Heisler subsequently agreed to cooperate with the continuing investigation of the criminal enterprise responsible for the load of 300 pounds of marijuana and revealed the role of Israel SANCHEZ in that enterprise.

34. Heisler confirmed that the previously mentioned vehicle was a "heat" vehicle driven by SANCHEZ.

35. Heisler identified SANCHEZ as involved in the transportation of bulk quantities of marijuana and United States currency of the criminal enterprise who was a target of the continuing investigation.

36. Research regarding SANCHEZ's driver's license revealed that he possessed a valid Arizona driver's license, XXXXX5425. SANCHEZ's listed address was 19214 West Colter Street, Litchfield Park, Arizona, 85340.

37. Heisler was released pending charges related to the Transportation of Marijuana, Possession of Marijuana, and Possession of Marijuana for Sale.

**Arrest of Israel SANCHEZ on September 21, 2011**

38. On or about September 21, 2011, SANCHEZ was arrested by the Phoenix Police Department for Conspiracy and Money Laundering. No case disposition was listed, because the case appears to be in litigation as of the date of this complaint.

39. This arrest was related to a large investigation conducted by DEA and the role SANCHEZ played was tangential to the main focus of the investigation. The charges

5

were amended to Conspiracy, Illegal Control of an Enterprise, Possession, Use, Production, Sale or Transportation of Marijuana, and Money Laundering.

40. On or about September 21, 2011, at approximately 3:40 p.m., investigators with the Phoenix Police Department conducted surveillance at 6509 South 18th Drive, Phoenix, Arizona.

41. At approximately 4:59 p.m., investigators observed the arrival of a silver-colored Acura bearing Arizona license plate ASR9528.

42. At approximately 6:02 p.m., investigators observed the Acura leaving the residence, occupied by two Hispanic males and a small child.

43. Investigators followed the vehicle until police officers in marked patrol units initiated a traffic stop at 4426 West Park at approximately 6:14 p.m.

44. Investigators smelled an odor of marijuana coming from the vehicle which led to the discovery of large sums of currency contained in a shoe box and shaving box.

45. Surveillance of the residence located at 6509 South 18th Drive, Phoenix, Arizona, continued after the departure of the Acura, resulting in additional contacts.

46. Investigators observed the arrival of two vehicles operating in tandem. The first vehicle was a Ford pick-up truck driven by Eden C. Ortiz ("Ortiz"). The second vehicle was a GMC pick-up truck driven by SANCHEZ.

47. Both trucks parked in front of the residence just south of the front door. Ortiz exited the Ford pick-up truck, and walked to the front door of the residence while SANCHEZ remained in the GMC.

48. Ortiz and SANCHEZ, were approached and contacted by Phoenix Police Department investigators.

49. As the investigators approached each vehicle they became aware of a very strong odor which they associated with the presence of Marijuana, emanating from within each vehicle.

6

50. SANCHEZ's vehicle was found to contain approximately $82,940.00 in United States currency.

51. Ortiz's vehicle was found to contain five bundles of marijuana weighing approximately 90 pounds.

52. During a post-Miranda interview, SANCHEZ denied any involvement in illegal activity, and claimed he was merely in the area to "meet someone."

53. SANCHEZ further advised investigators he sold cars for a living, and the $82,940.00 in United States currency found in his vehicle represented proceeds from the sale of two vehicles earlier that day.

54. SANCHEZ was questioned further about the currency, but declined to answer any further questions from Phoenix Police Department investigators.

55. During a post-Miranda interview, Ortiz admitted to being involved in trafficking marijuana, and stated he was in the process of delivering approximately 90 pounds of marijuana to 6509 South 18th Drive, Phoenix, Arizona. Ortiz claimed his role in the organization was minimal, and he was simply transporting marijuana from one location to another for financial compensation.

56. SANCHEZ was booked by the Phoenix Police Department on charges of Conspiracy and Money Laundering.

57. Ortiz was booked on charges of Conspiracy and Possession of Marijuana for Sale.

**Seizure of $46,500.00 in United States Currency**

58. On or about September 22, 2011, at approximately 9:50 p.m., Better Bail Bonds ("BBB"), also known as Arizona Asset Management Recovery, Inc., posted a bond in the amount of $48,000.00 for SANCHEZ's release.

59. On or about October 3, 2011, at approximately 10:00 a.m., investigators spoke with management at BBB. BBB management informed investigators that on September 22, 2011, at approximately 3:30 p.m., two females who identified themselves

as SANCHEZ's girlfriend and sister, along with several small children, traveled to the BBB Phoenix office and requested to post a $48,000.00 bond for SANCHEZ.

60. The two females advised BBB management that SANCHEZ was being held in the custody of the Maricopa County Sheriff's Office.

61. The "girlfriend" identified herself as Denise Guillen ("Guillen"). Guillen stated she did not have any identification, and had recently moved to Arizona from El Paso, Texas.

62. Guillen exited the office and obtained a black satchel from a vehicle she drove, which BBB's management described as a gold van bearing Arizona license plate 50R86.

63. A short time later, Guillen returned to the office with the black satchel, which she gave to BBB staff.

64. According to BBB management, when Guillen delivered the bag, she advised the bag contained currency which belonged to SANCHEZ. It appeared to the BBB staff that Guillen had no idea of the amount of currency inside the bag.

65. Upon reviewing the contents of the bag, BBB management observed various denominations of currency consisting of twenties, fifties, and hundreds, wrapped in rubber bands.

66. Suspicious of the circumstances regarding the bulk currency, its packaging, and the lack of knowledge of the amount of currency contained within the satchel, BBB staff asked Guillen if SANCHEZ was involved with "the Cartel." BBB management stated Guillen shrugged her shoulders, and did not answer the question.

67. BBB management stated Guillen provided a contact number of (928) 254-0669 with an address of P.O. Box 436, Camp Verde, Arizona.

68. A check of Arizona registration plate 50R86 identified the vehicle as a 1999 Dodge station wagon, registered to Mario and Violet Leon of 19214 West Colter Street, Litchfield Park, Arizona.

8

69. On September 23, 2011, BBB management met with SANCHEZ. SANCHEZ was observed driving a newer sedan bearing Arizona license plate AKC8759.

70. SANCHEZ provided an address of 476 South 3rd Street, Camp Verde, Arizona 86322.

71. Upon SANCHEZ's payment of additional bail bond fees, BBB staff observed SANCHEZ remove a large roll of one hundred dollar bills from his pocket.

72. BBB staff attempted to call the initial telephone number provided by Guillen and SANCHEZ, (928) 254-0669. The number was disconnected. SANCHEZ eventually contacted BBB staff and provided a new telephone number of (480) 245-0069.

73. A check of Arizona registration on license plate AKC8759 identified the vehicle as a 2012 Ford Focus, five-door sedan registered to PV Holding Corp., 300 Centre Point Drive, Virginia Beach, Virginia 23642 (Avis Budget Rental Group).

74. Based on the factors of SANCHEZ's frequent involvement with or utilizing large sums of U.S. currency, changing phone numbers, utilizing rental vehicles, and his presence at the scene of the delivery or transportation of controlled substances, all indicators of a person involved in drug trafficking and money laundering, investigators advised BBB management it was their intention to obtain a seizure warrant for the currency, which had been posted by associates of SANCHEZ for his bail bond.

75. The BBB Management agreed to cooperate with the investigation.

76. On or about October 3, 2011 (approximately 11 days later), at approximately 5:27 p.m., Mesa Police Department Sergeant J. Rolfe utilized his Certified Narcotic Detection canine to conduct a sniff of the currency at the BBB office in Mesa, Arizona. The currency had been segregated by the staff of BBB.

77. Sergeant J. Rolfe advised investigators the canine sniff of the currency revealed a negative alert. However, it had been several days since BBB management had obtained the currency from SANCHEZ's associates, and the currency had been removed

from the contaminated environment controlled by the associates of SANCHEZ at the time of his arrest, it would be unlikely for a positive canine alert.

78. On or about October 4, 2011, at approximately 12:00 p.m., TFO Fowler and TFO Roethle arrived at BBB, and requested access to the segregated funds

79. The BBB Management delivered an unknown quantity of currency which had been used to post SANCHEZ's bond, reported to be approximately $48,000.00. A warrantless seizure of the cash was conducted. Based upon the seizure of this sum, an Administrative Forfeiture was undertaken, a claim was filed, and the matter was referred to the Office of the U.S. Attorney for the filing of a civil forfeiture action.

80. TFO Fowler and TFO Roethle transported the currency in a sealed evidence bag to the Drug Enforcement Administration ("DEA") Phoenix Office.

81. On or about October 5, 2011, at approximately 11:00 a.m., Special Agent Jose Melendez, TFO Fowler, and TFO Roethle observed Brinks count the seized currency, which revealed a total of $47,000.00 in United States currency. The Brinks count also revealed $500.00 of the $47,000.00 was counterfeit currency. Therefore, the sum seized for forfeiture is $46,500.00.

**Seizure of $1,000.00 in United States Currency**

82. On or about October 5, 2011, investigators followed up with BBB management who revealed that on October 4, 2011, prior to releasing custody of the currency to TFO Fowler and TFO Roethle, BBB staff counted the currency previously determined to be $48,000.00, utilizing an electronic counting machine while in the presence of TFO Fowler and TFO Roethle.

83. Concluding their count, BBB management determined the amount was $49,000.00. Believing the bond fees from SANCHEZ's posted bond had not been completely retained by BBB, coupled with the fact that fees and the bond amount had been initially co-mingled, BBB staff retained $1,000.00 in United States currency prior to the delivery of the currency.

84. BBB management informed investigators that after the delivery of the currency to DEA Task Force Officers on October 4, 2011, a review of their records revealed that BBB had already retained their appropriate fees for SANCHEZ's bond. It was determined that this was a counting error on the part of the BBB staff during their attempt to verify funds and fees for SANCHEZ's bond.

85. On or about October 6, 2011, at approximately 10:00 a.m., TFO Fowler and TFO Roethle contacted the BBB staff again, and took custody of $1,000.00. Investigators transported the currency in a sealed envelope to Wells Fargo Bank where the currency consisting of $1,000.00 was converted into a cashier's check made payable to the U.S. Marshals Service. The $1,000.00 in United States currency was administratively forfeited by DEA on February 3, 2012.

86. BBB management received a receipt for each sum of currency seized by the investigators. Investigators also provided their telephone numbers to BBB, and subsequently requested contact with SANCHEZ and his family or associates.

87. On or about October 7, 2011, at approximately 2:00 p.m., TFO Fowler received a phone call from BBB staff who advised that they had received a phone call from Guillen who advised that she was on her way to retrieve the receipt for the seized currency. Guillen stated she was going to "fight the seizure," and claimed that the currency was given to her from a family member.

88. After learning of the seizure, Guillen and SANCHEZ claimed the currency was borrowed from an attorney. When the BBB staff pointed out the inconsistencies in her statements, Guillen claimed the attorney would not provide a receipt.

**Employment Records of Israel SANCHEZ**

89. On or about January 23, 2012, investigators issued a DEA Administrative Subpoena to Suntec Concrete, 2221 West Shangri-La Road, Phoenix, Arizona for SANCHEZ's employment records.

11

90. On or about January 24, 2012, investigators received employment records for SANCHEZ from Suntec Concrete. Records indicated SANCHEZ was employed as a laborer from February 2, 2005 to May 9, 2009. According to the W2 forms, SANCHEZ earned the following from Suntec: $25,607.78 in 2005; $65,078.26 in 2006; $68,602.50 in 2007; $47,478.39 in 2008; and $19,321.70 in 2009. Suntec Concrete verified they paid out $31,396.64 minus withholding to SANCHEZ upon his termination for an employee contributed 401K in 2010.

91. On or about January 23, 2012, in an attempt to verify the employment history of SANCHEZ, investigators issued a DEA Administrative Subpoena to Mission Academy High School, 5350 West Indian School Road, Phoenix, Arizona.

92. On or about January 24, 2012, investigators received employment records for SANCHEZ. Records indicated that SANCHEZ was employed with West Side Cleaning Service, 17331 West Maryland Avenue, Waddell, Arizona, between February 2011 and October 2011, where he received a reported income of $23,000.00.

93. Employment records for SANCHEZ were received from Reyes Orozco, Mission Academy's Security/Facilities Manager. According to Orozco, he owned West Side Cleaning Services and employed SANCHEZ as a private contractor who provided janitorial services.

94. It is substantially unlikely that SANCHEZ would live in Camp Verde, and drive daily to work as a janitor at a school on Indian School Road, Phoenix, Arizona.

95. On April 20, 2012, investigators from the Drug Enforcement Administration and Phoenix Police Department arrested SANCHEZ pursuant to an arrest warrant issued.

**Criminal History of Israel Sanchez**

96. On or about June 27, 2009, SANCHEZ was arrested and charged with Carrying a Concealed Weapon Without Permit in Phoenix Municipal Court in Phoenix, Arizona. SANCHEZ was found guilty and sentenced to 1 day in jail.

97. September 21, 2011, SANCHEZ was booked into the Maricopa County Adult Detention Center in Arizona on charges of Conspiracy, Illegally Conducting an Enterprise, and Sale or Transportation for Sale of Marijuana. The charges were amended to Conspiracy, Illegal Control of an Enterprise, Possession, Use, Production, Sale or Transportation of Marijuana, and Money Laundering. As of this Complaint, SANCHEZ is still incarcerated awaiting adjudication.

98. On or about August 24, 2012, SANCHEZ was charged with Marijuana Violation, Second Marijuana Violation, Illegal Control of Enterprise, Money Laundering and Conspiracy in Maricopa County Superior Court in Arizona, Case No. CR2012-006296.

**Seizure of Currency**

99. The following represents a breakdown of the $46,500.00 in United States currency seized from Better Bail Bonds, also known as Arizona Asset Management Recovery, Inc.:

| **Number of Bills** | **Denomination** | **Amount** |
|---|---|---|
| 288 | $ 100.00 | $28,800.00 |
| 172 | $ 50.00 | $ 8,600.00 |
| 455 | $ 20.00 | $ 9,100.00 |
| **Total:** | | **$46,500.00** |

100. On October 4, 2011, DEA commenced notice of administrative forfeiture on October 4, 2011.

101. On January 5, 2012, SANCHEZ filed a claim in the administrative proceeding.

102. The currency in this matter was seized on October 5, 2011, which would require DEA to provide notice of Administrative forfeiture no later than November 4, 2011. Due to continuing investigation involved in this case, a decision was made to request a day delay for the issuance of this notice.

103. On March 23, 2012, the Office of the United States Attorney for the District of Arizona filed under seal Ex Parte Motion to Extend Time to File Complaint for Forfeiture and/or To Obtain an Indictment Alleging Forfeiture for an additional one-hundred and twenty (120) days the Notice Period of 18 U.S.C. §983(a)(1)(A).

104. On March 26, 2012, in MC12-00029-PHX-ROS, Judge Silver granted an extension of time for one-hundred and twenty (120) days to August 4, 2012.

105. On August 3, 2012, the Office of the United States Attorney for the District of Arizona filed under seal Second Ex Parte Motion to Extend Time to File Complaint for Forfeiture for an additional sixty (60) days from August 4, 2012.

106. On August 8, 2012, in MC12-00029-PHX-ROS, Judge Silver granted an extension of time for sixty (60) days to October 5, 2012 to file a complaint.

**FIRST CLAIM FOR RELIEF**

107. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 106 above. Based on the aforementioned facts and circumstances, the above described defendant, the defendant currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it was furnished or intended to be furnished by a person in exchange for a controlled substance or listed chemical in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, or is proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*

**SECOND CLAIM FOR RELIEF**

108. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 106 above. The defendant currency is subject to forfeiture pursuant to conspiracy to engage in money laundering in violation of 18 U.S.C. §1956(h), therefore, forfeitable pursuant to 18 U.S.C. § 981(a)(1)(A).

**THIRD CLAIM FOR RELIEF**

109. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 106 above. The defendant currency is subject to forfeiture pursuant to 18 U.S.C. § 981 (a)(1)(C) which is personal property which constitutes or is derived from proceeds traceable to a violation of any offense constitution "specified unlawful activity" as defined in 18 U.S.C. §§ 1956(c)(7) and 1961.

WHEREFORE, the United States of America prays that process of warrant *in rem* issue for the arrest of the Defendant currency; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the Defendants be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

DATED this 17th day of September, 2012.

JOHN S. LEONARDO
United States Attorney
District of Arizona

*S/ Reid C. Pixler*

REID C. PIXLER
Assistant United States Attorney